William D. Hyslop
United States Attorney
Eastern District of Washington
Meghan M. McCalla
Assistant United States Attorneys
402 East Yakima Ave, Suite 210
Yakima, WA 98901
Telephone: (509) 454-4425

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

JASON WILLIAM CATHCART,

Defendant.

Case No.: 1:16-CR-2044-SAB-1

Government's Response to Defendant's Motion to Dismiss Indictment

Hearing: March 18, 2020
Time: 10:00 a.m.
Judge: Hon. Stanley A. Bastian
Place: Yakima

COMES NOW the Plaintiff, United States of America, by and through the United States Attorney for the Eastern District of Washington, William D. Hyslop, and Meghan M. McCalla, Assistant United States Attorney, and provides this Response to Defendant's Motion to Dismiss Indictment. ECF No. 86.

Defendant's Motion to Dismiss Indictment fails for two reasons: (1) the 70-day speedy trial clock has not lapsed. Because the government's Motion(s) for a Protective Order, as well as it's Motion to Continue Trial tolled the speedy trial clock, fewer than 70

speedy trial days have lapsed; (2) Defendant not only waived his rights under the Interstate Agreement on Detainers Act (IADA), but the Court also acted in accordance with Section 9(2) in returning Defendant to Washington State custody, as Defendant was given sufficient notice and an opportunity for a hearing on the matter.

Finally, should the Court find a violation of either the Speedy Trial Act (STA) or the IADA, dismissal *without* prejudice would be the appropriate remedy.

## RELEVANT PROCEDRUAL HISTORY

On June 14, 2016, Defendant was charged in a three-count indictment with Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), in Counts 1 and 2, and Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), in Count 3. ECF No. 1. On September 20, 2017, Yakima County Superior Court Judge Kevin S. Naught sentenced Defendant to an indeterminate sentence of 120 months to life of imprisonment for First Degree Child Molestation – Domestic Violence for the hands-on sexual offense that underlies the production of child pornography in Count 2. *See* Bates Discovery pages 3856-66. Defendant also received 20 months of imprisonment for Second Degree Incest. *Id.*

Because Defendant was in state custody at the time of the Indictment (ECF No. 1), the government sought a writ of *habeas corpus ad prosequendum* on December 6, 2017, after Defendant was sentenced in Yakima County Superior Court as noted *supra*. Magistrate Judge Dimke granted the motion for a writ on December 11, 2017. ECF Nos.

6, 7. On December 20, 2017, Defendant was arraigned on the federal Indictment. ECF No. 12. On December 21, 2017, this Court issued an order setting trial on February 26, 2018. ECF No. 18.

In advance of disclosing discovery on the case, the government filed an expedited Motion for Protective Order on January 3, 2018, requesting the Court issue a Protective Order requiring privacy protection of the minor victims' information, to include keeping documents containing the minor victims' information in a secure place and that filings containing private information about the minors be filed under seal. ECF Nos. 19, 20. The motion was uncontested. ECF No. 20. The Court issued an order granting the Motion for a Protective Order without a hearing on January 10, 2018. ECF No. 21. That same day, the government provided discovery to the defense. On January 29, 2018, the government filed a Stipulated Motion re: Computer Forensic Review Procedures for Child Pornography Contraband (characterized as a Motion for Protective Order by the Court). ECF No. 22. On February 1, 2018, Defendant filed his first Motion to Continue Trial citing, *inter alia*, that more time was needed to review the discovery in the case. ECF No. 24 at 2:13-15. The Court granted Defendant's request on the same day, and reset the trial to July 9, 2018. ECF No. 25. The Court also excluded the time between the first trial date (February 26, 2018) and the July 9, 2018 trial date from the speedy trial clock. *Id.* at 2:10-14. On February 5, 2018, the Court granted the second Motion for Protective Order and issued an order. ECF No. 27.

On May 29, 2018, Defendant filed a Motion to Suppress the evidence. ECF No. 30. On June 13, 2018, the Court held a hearing on the motion. ECF No. 41. At that time, the Court took the motion under advisement. *Id.* The Court excluded from the speedy trial clock the days the Court was taking the motion under advisement. *Id.* On July 5, 2018, the Court granted Defendant's Motion to Suppress. ECF No. 44. On July 17, 2018, the government filed its Notice of Interlocutory Appeal and a Motion to Stay proceedings. ECF Nos. 48, 49. On August 1, 2018, the Court granted Defendant's oral motion to release Defendant from the writ of *habeas corpus ad prosequendum* and returned him to Washington Department of Corrections (DOC) custody. ECF Nos. 54, 59. On November 13, 2019, the Ninth Circuit Court of Appeals issued its Mandate reversing the Court's granting of the motion to suppress.

On November 20, 2019, the Court held a status conference. ECF No. 74. Defendant was not present, because he had been transferred to Clark County Detention Center in Las Vegas, Nevada to answer to outstanding charges there. *Id.* The Court requested the parties confer regarding the speedy trial days that had lapsed. At that time, the government calculated that 69 out of 70 days passed, and Defendant concurred in the calculations excepting the six days between the government's filing of the January 3, 2018 Motion for Protective Order and the Court's granting of said motion on January 9, 2018. *See* ECF No. 75.

On December 10, 2019, Defendant was sentenced in the District Court of Clark County, Nevada to not less than 12 months and no more than 30 months imprisonment concurrent with Defendant's Yakima County Superior Court conviction, noted *supra*. *See* Bates discovery pages 4024-25. Defendant was then returned Washington DOC custody. On January 10, 2020, the government again moved for a writ of *habeas corpus ad prosequendum*, which Magistrate Judge Dimke granted on January 13, 2020. ECF Nos. 76, 77, 78. On January 15, 2020, the government also filed a Motion to Continue pursuant to the ends of justice in accordance with 18 U.S.C. § 3161(h)(7)(A). ECF No. 79. On February 7, 2020, the Court held a pretrial conference and motions hearing. ECF No. 83. At that time, Defendant orally moved for dismissal of the indictment based on STA and IADA violations. *Id.* The Court took the government's Motion to Continue under advisement at that time and set motions filing deadlines. *Id.* The Court also reset the February 24, 2020 trial date to March 24, 2020 and excluded the time between those trial dates from the speedy trial clock. ECF No. 84 at 2:19-23.

On February 18, 2020, Defendant filed his brief in support of his oral Motion to Dismiss Indictment. ECF No. 86.

## ANALYSIS

*A. There is no Speedy Trial Act violation, because the government's Motion(s) for Protective Order and Motion to Continue tolled the speedy trial clock.*

Because the government's Motions for Protective Order (ECF Nos. 19, 22) tolled the speedy trial clock, the STA's 70-day speedy trial deadline has not lapsed. Based on

the government's initial speedy trial calculation, only 69 of the permissible 70 speedy trial days have passed.[1] *See* ECF No. 75. Hence, there is no Speedy Trial Act (STA) violation.

Defendant bears the burden of establishing a STA violation. 18 U.S.C. § 3162(a)(2) ("The defendant shall have the burden of proof of supporting such a motion [to dismiss on speedy trial grounds]"). The law entitles a criminal defendant a trial within seventy (70) days of the issuance of an indictment or the defendant's appearance at arraignment, whichever comes later. *Id.* at § 3161(c)(1). Periods of delay may be excluded from the calculation of those 70 days. For example, delay as a result of an interlocutory appeal or the filing of a pretrial motion are excludable from the speedy trial clock pursuant to § 3161(h)(1). *Id.* at § 3161(h)(1)(C), (D).

Defendant has failed to meet his burden of establishing a violation of the 70-day speedy trial clock.

1. <u>There is no violation of the 70-day STA deadline.</u>

Because periods of delay between Defendant's arraignment on the Indictment and the current trial date are excludable, the 70-day speedy trial deadline has not lapsed.

Previously, the government calculated that 69 out of the permissible 70 speedy trial days had lapsed. However, upon further review, it believes that the days are, at most, 58 out of 70 days.

[1] The government will revisit the speedy trial calculation again below.

As noted, *supra*, the speedy trial clock is tolled for "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." *Id.* at § 3161(h)(1)(D). When calculating which days to exclude, the Ninth Circuit holds that the day a pretrial motion is filed through and including the day the Court hears the motion are excluded from the speedy trial clock. *United States v. Daychild*, 357 F.3d 1082, 1092-93 (9th Cir. 2004). At the time, the government filed its Notice of Speedy Trial Days Remaining (ECF No. 75), it had not excluded the day that the Court ruled ("heard") the motion. Additionally, the parties failed to note in its Notice of Speedy Trial Days Remaining (ECF No. 75) the Stipulated Motion re: Computer Forensic Review Procedures for Child Pornography Contraband with the attached Protective Order, which was filed on an expedited basis on January 29, 2018. ECF Nos. 22, 23. On February 5, 2018, the Court granted said motion and issued an order as such. ECF No. 27. Thus, the days between and including January 29 through February 5, 2018 should be excluded from the clock pursuant to § 3161(h)(1)(D). These days overlap with other events that toll the speedy trial clock, such as Defendant's Motion to Continue Trial. ECF No. 24.

Thus, the speedy trial days calculate as follows:

| **Date** | **Event** | **Effect** |
|---|---|---|
| December 20, 2017 | Arraignment (ECF No. 12) | Speedy trial clock begins. 18 U.S.C. § 3161(c)(1). |

| | | |
|---|---|---|
| January 3, 2018 | Motion for Protective Order (ECF No. 19) | Tolling of speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(D) |
| January 9, 2018 | Motion for Protective Order granted (ECF No. 21) | Speedy trial clock begins running the next day on 1/10/18. |
| (Seven Days Excluded Between and Including 1/3/18 and 1/9/18) | | |
| **13 days of speedy trial have run between 12/20/17 and 1/2/18** | | |
| January 29, 2018 | Stipulated Motion re: Computer Forensic Review Procedures for Child Pornography Contraband (ECF No. 22) | Tolling of speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(D) |
| January 31, 2018 | Motion to Continue Trial (ECF No. 24) | Tolling of speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(D) |
| February 1, 2018 | Motion to Continue Trial granted (ECF No. 25). *Order excludes delay from 2/26/18 (first trial date) to 7/9/18 (new trial date).* | Speedy trial clock still tolled due to pending Stipulated Motion (ECF No. 22). 18 U.S.C. § 3161(h)(1)(D) |
| February 5, 2018 | Stipulated Motion re: Computer Forensic Review Procedures for Child Pornography Contraband (i.e., Motion for Protective Order) granted (ECF No. 27) | Speedy trial clock begins running the next day on 2/6/18. |
| (Eight Days Excluded Between and Including 1/29/18 and 2/6/18) | | |
| **18 days of speedy trial have run between 1/10/18 and 1/28/18** | | |
| **20 days of speedy trial have run between 2/6/18 and 2/26/18** | | |
| *Between 5/29-7/9 multiple motions and events would also toll the speedy trial clock, but the clock tolled nonetheless by Court Order (ECF No. 25).* | | |
| July 9, 2018 | Trial date (ECF No. 25) | Speedy trial clock begins running again |
| July 17, 2018 | Notice of Interlocutory Appeal and Motion to Stay (ECF Nos. 48, 49) | Tolling of speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(C), (D). |
| **7 days of speedy trial have run between 7/9/18 and 7/16/18** | | |

| | | |
|---|---|---|
| January 10, 2020 | Motion for Writ of Habeas Corpus ad Proseqeundum (ECF No. 76). | Speedy trial clock unaffected because of Defendant's unavailability pursuant to 18 U.S.C. § 3161(h)(3)(A), (B). |
| January 13, 2020 | Motion for Writ of Habeas Corpus ad Prosequendum granted and writ issued (ECF No. 78). | Speedy trial clock unaffected because of Defendant's unavailability pursuant to 18 U.S.C. § 3161(h)(3)(A), (B). |
| January 15, 2020 | Government Motion to Continue (ECF No. 79) | Speedy trial clock unaffected until Defendant made available pursuant to 18 U.S.C. § 3161(h)(3)(A), (B).; Tolling of speedy trial clock pursuant to pursuant to 18 U.S.C. § 3161(h)(1)(D). |
| February 6, 2020 | Pretrial Conference / Hearing on Motions / Defendant Oral Motion to Dismiss Indictment / Court takes Government Motion to Continue under advisement (ECF Nos. 83, 84). | Tolling of speedy trial clock pursuant to pursuant to 18 U.S.C. § 3161(h)(1)(D). |
| *Between 2/24/20 - 3/24/20 speedy trial clock tolled pursuant to Court order (ECF No. 84).* | | |
| **0 days of Speedy Trial have run since 7/16/18 due to Interlocutory Appeal, Defendant Unavailability, and Pretrial Motion Filings** | | |
| **TOTAL speedy trial days: 58 out of 70** | | |

Given the above permissible exclusions of speedy trial days, only 58 of the 70 speedy trial days have elapsed. Therefore, there is no STA violation.

2. <u>The Government's Motion(s) for a Protective Order and to Continue toll the speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(D).</u>

Delay resulting from the Government's Motion for a Protective Order (ECF No. 19), Stipulated Motion (ECF No. 22),[2] and Motion to Continue (ECF No. 79) is excludable pretrial delay pursuant to § 3161(h)(1)(D). Defendant argues that said motion(s) should not toll the speedy trial clock because they are either *pro forma* motions that did not result in any real delay (Motions for Protective Order) or equity demands it not count (Motion to Continue) because it was "crafty". ECF No. 86 at 20, 21. However, Defendant selectively reads cases from other circuits and fails to account for the plethora of Ninth Circuit case law that establishes such motions toll the speedy trial clock.

The Supreme Court has noted that the periods of delay contemplated in § 3161(h)—including those delays resulting from pretrial motions—were intended to be automatic. *Henderson v. United States*, 476 U.S. 321, 327 (1986). Section 3161(h)(1)(D) (previously subsection 3161(h)(1)(F)) excludes periods of "delay resulting from *any pretrial motion*, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion". 18 U.S.C. § 3161(h)(1)(D) (emphasis added). In this context, the Supreme Court noted two different types of pretrial motions: those requiring a hearing and those not requiring a hearing that result in a prompt disposition. *Henderson*,

[2] While Defendant did not explicitly discuss the Stipulated Motion (ECF No. 22) in his briefing, the government anticipates that Defendant will take the same stance for this motion as he did with the first Motion for a Protective Order (ECF No. 19) that he argues against in his motion, particularly as the motion was stipulated to by the parties.

476 at 329 (internal quotations omitted). When determining how much time to exclude, the Supreme Court noted that for those motions that are decided without a hearing, only 30 days from the time the motion is "under advisement" by the court will be excluded. *Id.* (citing to the STA provision, now § 3161(h)(1)(H), that demands no more than 30 days of excludable time during which a motion is actually under advisement by the court). The Supreme Court further pointed to the Senate Committee on the Judiciary's reasoning behind this 30-day advisement period:

> In using the words "prompt disposition" [in now Subsection (h)(1)(D)], the committee intends to make it clear that, in excluding time between filing and disposition on the papers, the Committee does not intend to permit circumvention of the 30-days, "under advisement" provision contained in Subsection (h)(1)(J) [now (h)(1)H)]. Indeed, *if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days*.

*Id.* (quoting S.Rep. No. 96-212, at 34S.Rep. No. 96-212, at 34) (emphasis added). The Senate Committee on the Judiciary specifically noted simple or routine motions that do not require a hearing as still excludable from the 70-day speedy trial calculation. *Id.* The Supreme Court's ruling affirmed the Ninth Circuit's holding in *United States v. Henderson*, 746 F.2d 619, 622 (9th Cir. 1984). There, the Ninth Circuit held that the STA "excludes delays resulting from pretrial motions without qualification." *Id.* at 325 (quoting *United States v. Henderson*, 746 F.2d 619, 622 (9th Cir. 1984)).

Years later, the Ninth Circuit addressed *pro forma* motions in the context of the STA. *United States v. Sutter*, 340 F.3d 1022 (9th Cir. 2003). The court reiterated that

"[e]xclusion of pre-trial motion delay is automatic." *Id.* at 1027. Moreover, the "district court need not make any findings explaining the need for the delay, nor does the delay need to be 'reasonably necessary' to be excluded." *Id.*

Defendant relies heavily on *United States v. Clymer* for the premise that the Motion(s) for a Protective Order did not delay the trial, and therefore the time during which they were pending should not be excluded from the speedy trial clock. 25 F.3d 824, 830 (9th Cir. 1994). In *Clymer*, the Ninth Circuit acknowledged that any period of delay in the trial must result from the pretrial motion. *Id.* The court also reiterated that the resulting delay is automatically excluded from STA calculation, regardless of how unreasonable or unnecessary. *Id.* Notably, the *Clymer* court's holding specifically addressed a defense motion to dismiss that the district court held in abeyance until after the trial. *Id.* at 829-30. Because the motion was held over until *after* the trial, the court determined that the delay only coincided with or accompanied the pendency of the motion, i.e., that the trial was not delayed as a result of the pendency of the motion. *Id.* at 830. Instead, the opposite was true—"the delay in the commencement of the trial caused the delay in hearing the motion." *Id.* at 831.

Not only is *Clymer* distinguishable from the instant case, in which the filing of the motions resulted in delay, it also preceded *Sutter*, which held that even *pro forma* motions are under advisement for the limited 30-day period permitted under § 3161(h)(1)(H), and are thus excludable from the speedy trial clock. *Sutter*, 340 F.3d at 1032. The

government's Motion(s) for a Protective Order (ECF Nos. 19, 22) and Motion to Continue (ECF No. 79) necessitate(d) action before trial. *See United States v. Medina*, 524 F.3d 974, 984 (9th Cir. 2008) (the defendant's motion on its face required action before trial).

**a. Motion(s) for Protective Order**

Defendant contends that the first Motion for Protective Order (ECF No. 19) did not affect the trial date and did not impact scheduling, "or either of the parties' respective responsibilities and obligations during that period." ECF No. 86 at 15-16. This is inaccurate. The government waited until the Court ruled on the motion before it handed over discovery to defense in order to protect the victims described in that discovery, which it said as much in its Motion to Expedite accompanying the Motion for Protective Order. ECF No. 20 ("the discovery in the present case is of a significant and sensitive nature, as it relates to the sexual exploitation of young minor victims. Thus, the Government would request this Court hear the Government's motion on an expedited basis to ensure the expedient exchange of discovery by the parties in this case, pursuant to the protective order . . . ."). Thus, in order for the government to provide discovery to Defendant and for Defendant to review the discovery, the government requested a ruling from the Court on the Motion, even if it was uncontested. The government provided the discovery on January 10, 2018, the day following the Court's ruling on January 9, 2018. ECF No. 21.

The delay caused by the pretrial motion certainly impacted the trial, because (1) Defendant's substantive filings, including his Motion to Suppress (ECF No. 30), were

filed in accordance with the Court's ruling on the Motion for Protective Order, and (2) Defendant cited the need for more time to review discovery—the delay in receiving it due to awaiting a ruling on the Motion for Protective Order—and requested a continuance of trial (ECF No. 24). First, Defendant admitted in the instant motion that the Court's ruling on the Motion for Protective Order (ECF No. 19, 21) affected how he proceeded: when Defendant filed his Motion to Suppress, he did so "under seal rather than publicly, in accordance with the protective order." ECF No. 86 at 17:6-8. Second, Defendant filed his first Motion to Continue on January 31, 2018, twenty-one days following discovery disclosure, 2 days after the pretrial motions deadline, and 26 days preceding the first scheduled trial date. *See* ECF No. 24. In his motion, Defendant cited, *inter alia*, that the "reason for the request is because more time is needed to review the voluminous discovery that the government began providing on January 10, 2018 . . . ." ECF No. 24 at 2:13-16.

The same trial impact applies to the Stipulated Motion (i.e., second Motion for Protective Order). ECF No. 22. Although stipulated, the government needed the Court's ruling on the Motion for Protective Order, laying out the procedures to be followed for the defense to review the forensic copy of the electronic evidence. A review of this evidence would be necessary to the Defendant's preparation for trial.

Thus, the time between and including the motions being filed and the Court's ruling on said motions, is excludable pursuant to the STA. *Henderson*, 476 U.S. at 325 (the STA

"excludes delays resulting from pretrial motions without qualification") (quoting *United States v. Henderson*, 746 F.2d 619, 622 (9th Cir. 1984)).

**b. Government's Motion to Continue**

Just as Defendant's motions to continue trial tolled the speedy trial clock, so does the government's motion to continue (ECF No. 79). Defendant makes an equity argument that the speedy trial clock should not toll due to the government's Motion to Continue because it was "crafty" and "premised on the need to avoid a speedy trial violation." ECF No. 86 at 21:5, 16-18. However, this is not a basis to ignore the excludable delay provisions contained in § 3161(h)(1)(D) or the case law noted *supra*. Defendant unfairly accuses the government of being disingenuous and lacking good faith in its motion.

First, the Motion to Continue trial was based on the correct understanding that, in order for the parties, including the Court, to comport with the STA, it would need to immediately schedule trial upon Defendant's return on the writ of habeas corpus and that there would be (a) no way to determine when precisely that date would fall, and (b) to be prepared for trial immediately thereafter. The government's motion was in good faith and intended to comport with the law. Defendant fails to even acknowledge the impact of last-minute trial settings on the victims in the case. His arguments pertaining to the new Nevada convictions are as unfounded and short-sighted as his arguments regarding "craftiness" and bad faith. Obtaining conviction documents and then preparing amended motions in limine are not "ministerial" and are dependent upon a response from another

jurisdiction. Too, the government could not issue a writ before the Defendant was finally convicted in Nevada to avoid an IADA issue. Additionally, he was to be returned from Nevada to Washington DOC custody immediately after conviction, so the government had to wait until he was back in Washington DOC custody to know *where* to issue the writ. Moreover, the court must grant the writ before it can issue. So the government's "control" over when a writ is issued is not a valid argument.

Second, the Motion to Continue immediately tolled the speedy trial clock pursuant to § 3161(h)(1)(D), in which the STA excludes any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." While the Court held a brief hearing following the motion's filing, the Court has yet to rule on the motion and the speedy trial clock remains tolled.

Third, the Court explicitly determined at the February 6, 2020 pretrial conference that it was taking the government's Motion to Continue under advisement. ECF No. 83. Motions that are under advisement also toll the speedy trial clock for 30 days pursuant to § 3161(h)(1)(H). *See also Henderson*, 476 U.S. at 329; *Sutter*, 340 F.3d at 1032.

As multiple provisions of the STA and higher courts' interpretation thereof dictate that the delay occasioned by the government's Motion to Continue is excludable, the STA has not been violated by the passage of time since Defendant's return to federal custody.

//

*B. There is no IADA violation, because Defendant's request to return to Washington DOC custody constituted a waiver of his IADA rights, and the Court properly exercised its authority under § 9(2) to return Defendant to state custody.*

1. Relevant Background on the IADA.

The IADA, located in Appendix 2 of Title 18 of the United States Code, is an interstate compact between 48 states, the Federal government, and the District of Columbia that establishes uniform procedures in lodging a prisoner detainer for transfer from one state in which the individual is imprisoned to answer to charges in another state. *See Alabama v. Bozeman*, 533 U.S. 146, 148 (2001). "The agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State. And it seeks to minimize the consequent interruption of the prisoner's ongoing prison term." *Id.* A "state" includes the federal government. 18 U.S.C. app. 2, § 2, Art. II(a).

Article IV governs the anti-shuttling provisions of the IADA, which are at issue here. Article IV(a) provides: "[t]he appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V(a) . . . ." *Id.* at Art. IV(a). Thus, for the IADA to apply, the receiving state must first lodge a detainer.[3] *Id.*

[3] United States Secret Service lodged a detainer in this case following Defendant's indictment, so the IADA applies in this case.

Additionally, the receiving state must not return the defendant to the sending state before the defendant has had his trial in the receiving state. *Id.* at Art. IV(e) ("If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."); *Bozeman*, 533 U.S. at 150. If a state government violates Art. IV(e), the court is required to dismiss the charging document with prejudice. *Id.* However if the receiving state is the Federal government, the court may dismiss the charging document with or without prejudice, taking into account three factors, discussed *infra*. *Id.* at § 9(1).

Further, Section 9 of the IADA permits the district court to return the prisoner to the custody of the sending state prior to his federal trial if the defendant and the United States are given reasonable notice, and each have an opportunity for a hearing. *Id.* at § 9(2) ("it shall not be a violation of the agreement on detainers if prior to the trial the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court issued after reasonable notice to the prisoner and the United States and an opportunity for a hearing.").

2. <u>Defendant waived his rights under the IADA by requesting to be returned to Washington DOC custody.</u>

Defendant's motion for dismissal based on a violation of the IADA utterly fails, because he voluntarily withdrew from its protections when he requested to be returned to

Washington DOC custody before he had his federal trial. Defendant argues that his return to Washington DOC custody from federal custody before his federal trial, and thus his transport to and from Nevada state custody, violates the IADA. However, Defendant completely ignores explicit Ninth Circuit law that indicates a defendant waives the IADA's protections when he requests a transfer of custody before trial in the receiving jurisdiction. *United States v. Black*, 609 F.2d 1330, 1334 (9th Cir. 1979); *Brown v. Wolff*, 706 F.2d 902, 907 (9th Cir. 1983) ("A prisoner may waive his IAD rights, however, if he affirmatively requests to be treated in a manner contrary to the procedures prescribed by the IAD.").

The Ninth Circuit expressly holds that "A defendant waives the protections of the IAD's anti-shuttling provisions when he requests the transfer before final disposition of the outstanding charges." *Black*, 609 F.2d at 1334. The waiver need not be knowing or intelligent. *Id.* In this case, Defendant unequivocally requested transfer back to Washington DOC. He not only admits as much in the instant motion (ECF No. 86 at 5:9-11), but it is explicit in the transcripts of the hearings at which he made the request. ECF No. 69 (Tr. of July 18, 2018 Status Hearing) at 6:17-20; ECF No. 70 (Tr. of Aug. 1, 2018 Motion Hearing) at 8:7-10. On July 18, 2018, following the Court's granting of the motion to suppress, when faced with being housed at the Yakima County Jail pending the interlocutory appeal in this case, defense counsel Sporn, on behalf of Defendant, moved for Defendant's release from the federal writ of *habeas corpus ad prosequendum*: "So I

would move for Mr. Cathcart to be released back into state custody so he could continue serving his state sentence where he was prior to being brought over." ECF No. 69 at 6:17-20. The Court granted Defendant's request after another hearing on August 1, 2018. ECF No. 70 at 10:5-7.

At both hearings, the government reiterated its concerns that releasing Defendant from the writ would likely result in the state of Nevada executing its warrants for its outstanding child molestation charges. The government warned of the possibility that Nevada could writ Defendant over from Washington DOC, and that, in doing so, the federal government would lose access to him until those proceedings had been completed. ECF No. 69 at 7-8; ECF No. 70 at 6:9-10. The government also warned against possible anti-shuttling issues. ECF No. 69 at 8:5-20; ECF No. 70 at 6-7. Defendant was thus warned about the IADA's anti-shuttling provisions.

Despite being warned, Defendant persisted in his request to be transferred back to Washington DOC, thereby waiving any rights he had under the IADA. *Black*, 609 F.2d at 1334. Defendant's case is like that in *United States v. Black*. 609 F.2d at 1334. There, the defendant pleaded guilty to his federal charges after being transferred to federal custody from state custody. *Id.* at 1332-34. The defendant requested on three different occasions that he be returned to state custody before he was ultimately sentenced in federal court. *Id.* at 1334. Each request was granted. *Id.* The defendant then complained of a violation of the IADA's anti-shuttling provisions. *Id.* The Ninth Circuit denied the

defendant's appeal, noting, "The protections of the IAD are not founded on constitutional rights, or the preservation of a fair trial, but are designed to facilitate a defendant's rehabilitation in prison and to avoid disruptions caused when charges are outstanding against the prisoner in another jurisdiction. We conclude that Black, when he requested the return to state custody, waived his right and could not later contend that he did not do it knowingly and intelligently." *Id.*

Defendant attempts to impute responsibility on the government for his transportation to and from Nevada. He unreasonably tries to hold the government responsible for recognizing the possibility of the transportation to/from Nevada, ignores that the government objected to him being released from the writ, and then blames the government when he got what he wanted—return to Washington DOC custody. It defies logic that Defendant requested transportation, *over the government's objection*, knowing he could be "ping-ponged" to/from Nevada, and wishes to hold the United States responsible for the consequences of his *own request*. Moreover, what authority did the government have to stop Nevada from writting Defendant to Clark County once he was out of federal custody? None.

Here, Defendant specifically requested that he be released from federal custody pending the interlocutory appeal. ECF No. 69 at 6:17-20. Moreover, at the two hearings in July and August, he was warned about the possible consequences of leaving federal custody, and persisted in his request. ECF No. 69 at 8:5-20; ECF No. 70 at 6-7. Like

*Black*, Defendant waived his IADA anti-shuttling rights and cannot now contend that he did not do so knowingly and intelligently. *Black*, 609 F.2d at 1334.

3. <u>The Court appropriately exercised is abrogation authority pursuant to Section 9(2) of the IADA.</u>

There has been no violation of the IADA's anti-shuttling provisions, because the Court provided sufficient notice to Defendant and the United States that it was considering returning Defendant to state custody before the trial on the instant federal case, and held a hearing thereafter pursuant to § 9(2). Section 9(2) of the IADA provides: "it shall *not* be a violation of the agreement on detainers if prior to trial the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court issued after reasonable notice to the prisoner and the United States and an opportunity for a hearing." 18 U.S.C. app. 2, § 9(2) (emphasis added).

Here, the Court returned Defendant to Washington DOC custody after it gave Defendant and the United States reasonable notice it was considering abrogating the writ, and thus provided two weeks before the next hearing on the matter. *See* ECF No. 69 at 9:5-18 (informing Defendant at the July 18, 2018 status hearing that the Court would have a hearing in two weeks, and that the Court was "not inclined to make, under my order, Mr. Cathcart sit though the circuit's decisional process, in the Yakima County Jail."). On August 1, 2018, the Court held a second hearing, in which Defendant reiterated his belief that he should be returned to state custody and in which the government reiterated its objection to releasing Defendant from the writ. *See* ECF No. 70 at 5-10.

Thus, the Court complied with § 9(2) and abrogated the IADA's anti-shuttling provisions. Therefore, Defendant cannot now claim a violation of the IADA. 18 U.S.C. app. 2, § 9(2).

*C. Assuming, arguendo, the Court finds an STA or IADA violation, dismissal without prejudice is the appropriate remedy.*

While the United States does not concede a violation of the speedy trial clock or the IADA, should the Court find a violation, dismissal without prejudice is appropriate.

The sanctions for both an STA and IADA violation are the same: dismissal of the charges with or without prejudice. Section 3162(a)(2) provides the sanctions for STA violations, mandating dismissal of the applicable charges if a defendant is not brought to trial within the 70-day period contemplated by § 3161(c) minus excludable delays. 18 U.S.C. § 3162(a)(2). Section 9(1), taken in conjunction with Art. IV(e) of the IADA, indicates that, in the context of the United States as the receiving state, a violation of the IADA requires dismissal of the charging document with or without prejudice at the Court's discretion and considering three factors.

Those factors for dismissal with or without prejudice are the same for the IADA as they are for the STA: (1) the seriousness of the offense, (2) the facts and circumstances of the case that led to dismissal, and (3) the impact of reprosecution on the administration of the STA/IADA and on the administration of justice. 18 U.S.C. app. 2, § 9(1); 18 U.S.C. § 3162(a)(2). Because the considerations are the same for both the STA and IADA, the government addresses them in tandem below.

Here, the statutory factors weigh against dismissal with prejudice.

1. <u>Seriousness of the Offense</u>

First, offenses involving child pornography are incredibly serious. The penalty for Production of Child Pornography is a mandatory minimum of 15 years. 18 U.S.C. § 2251(a). Such a penalty clearly demonstrates Congress's intent to severely punish producers of child pornography beyond the underlying hands-on offense. *Id.*; *United States v. Maier*, 646 F.3d 1148, 1156 (9th Cir. 2011) ("Congress's policy conclusion that receipt or distribution of child pornography is an extremely serious offense that merits severe punishment"). The same is true of possession of child pornography, in which a conviction could result in up to 10 years of imprisonment. 18 U.S.C. § 2252A(a)(5)(B). Moreover, Defendant does not contest that the charged offenses are serious. ECF No. 86 at 25:3-4; *United States v. Medina*, 524 F.3d 974, 982 (9th Cir. 2008) (district court noted that the defendant did not contest the seriousness of his offense).

However, Defendant misses the mark altogether in categorizing Defendant's *production* of child pornography as "incidental to and less serious than the underlying sexual abuse". ECF No. 86 at 25:9-10. As an initial matter, Defendant's implied suggestion that the government must first show that the offense is serious and then go on to show it is serious in the context of his hands-on state conviction is offensive and finds no footing in the STA or IADA. Neither the government nor the Court need rank the seriousness of sex crimes against minors; that it is a sex crime against a minor is sufficient.

*United States v. Cox*, 553 F. App'x 123, 129 (3d Cir. 2014) (dismissal without prejudice appropriate given "seriousness of the charges" of distribution of child pornography); *United States v. Fritzsching*, 245 F. Supp. 3d 1269, 1273 (D. Utah 2017) (dismissal without prejudice of indictment charging defendant with receipt and possession of child pornography appropriate given the seriousness of the charges). And in this case, Defendant's conduct involves multiple victims, not just his own family members but also other victims of child pornography.

Defendant rightly acknowledges that Count 1 of the Indictment charges production of child pornography involving Victim G, and that that conduct has not been addressed at all. However, Defendant's reliance on a state court decision to suppress evidence is misplaced, as it in no way addresses the statutory consideration of the seriousness of the offense. Too, the state court's decision has no bearing on the federal charge; the Ninth Circuit has found the evidence in this *federal* case is not to be suppressed; and Defendant's sentence for other crimes is inconsequential. Defendant's arguments are more appropriate sentencing allocutions, if anything, than whether to dismiss with or without prejudice. Instead, Defendant wishes to pollute the clarity of how serious the charges against him are by repeatedly overemphasizing his indeterminate state sentence of 10-life. But to say that continued prosecution is "more symbolic than substantive" offensively diminishes the impact on the victims and the import of holding Defendant accountable for, in this case, some of the most serious of federal crimes.

2. Facts and Circumstances that Led to Dismissal

Second, as noted *supra*, events beyond the government's control produced gaps in the disposition of the case, most apparently Defendant's lack of presence in the Eastern District of Washington, which was of his own making. Defendant's characterization of the STA and IADA "problems" as government-created or –exacerbated is altogether false. All of the government's filings in this case were sound, in good faith, and absolutely necessary, particularly the Motion for Protective Order and interlocutory appeal. Given the amount of pleadings that child pornography cases generate, ensuring there is a protective order in place to guarantee the safety and privacy of the victims is paramount. The interlocutory appeal was unquestionably necessary to the prosecutability of this case and not simply a "litigation tactic[]". ECF No. 86 at 26:22.

Moreover, in terms of the IADA, the interlocutory appeal has not negatively impacted Defendant with regard to his state prison term—he was released from federal custody during the pendency of the appeal and made himself available and subject to Nevada's warrants.

In terms of the STA, should the Court find the days that the Motion(s) for Protective Order were pending are not excludable, the government's reliance on that excludable time was essentially a technical mistake. *See Medina*, 524 F.3d at 982 (violation of STA was of technical nature because of misbelief of excludable time).

Finally, given Defendant's repeated motions for a continuance, it does not appear Defendant has been truly prejudiced by any delay; more importantly, Defendant fails to detail any prejudice to his defense. *See, e.g., United States v. Walker*, 255 F.3d 540, 543 (8th Cir. 2001) (in context of IAD speedy trial provision akin to § 3161(j), the defendant's assertions of prejudice unavailing after three trial continuances); *Medina*, 524 F.3d at 981-82.

3. Impact of Reprosecution on the STA and IADA and on the Administration of Justice

Finally, dismissal without prejudice in this case would do nothing to impugn the effect of the STA or the IADA and would ensure the administration of justice in Defendant's case. "Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds." *United States v. Taylor*, 487 U.S. 326, 342 (1988).

In this case, the government objected to Defendant's release from federal custody at both the July 18 and August 1, 2018 hearings to help Defendant avoid the very thing about which he now complains (transport to and from Nevada). Because Defendant's IADA concerns were self-created, dismissal with prejudice does nothing to teach the government a lesson and punishes only the victims.

With regard to the STA, at worst, excluding the Motion(s) for Protective Order days is more an issue of misunderstanding or miscalculating the speedy trial clock than a

strategic delay of time with the goal of prolonging Defendant's prosecution. The same is true of Defendant's return to federal custody and the government's Motion to Continue—a necessary delay in the interest of justice, in particular for the notice to and trial preparation of the victims. There is nothing in the record to support that the United States acted in bad faith. *See Medina*, 524 F.3d at 982 ("district court acted well within its discretion in noting that there was no evidence of bad faith on the part of the government"). The Ninth Circuit acknowledged in *Medina* that the district court "noted that both counsel, as well as the court, 'bear their fair share of responsibility for the Speedy Trial Act violation.'" *Id.*

Defendant's argument that dismissal without prejudice would only elongate Defendant's time to trial is always present for such dismissal in STA and IADA cases, which Congress would have considered when making dismissal without prejudice an option for the court and delineating the three considerations of with/without prejudice noted above.

Upon review of these factors, dismissal with prejudice is not appropriate in this case. *See id.* (district court did not err in dismissing drug indictment without prejudice for technical speedy trial violations without any indication the government acted in bad faith).

**CONCLUSION**

The speedy trial clock for this Indictment (ECF No. 1) rests at 58 days out of a permissible 70 days pursuant to § 3161(c), because the filing of the government's motions

just as much toll the speedy trial clock as do Defendant's. *See supra*. No speedy trial violation has occurred, barring dismissal.

Moreover, because Defendant requested transfer from federal custody over government objection, he has waived any claim of a violation under the IADA. The Court also appropriately followed the IADA's § 9(2) requirement to provide sufficient notice to the parties and a hearing. Defendant was provided notice, persisted in his request, and was given a hearing. Therefore, there is no IADA violation.

Nonetheless, should the Court find a violation of either the STA or IADA, dismissal *without* prejudice is the appropriate remedy.

Dated: March 3, 2020.

William D. Hyslop
United States Attorney

*s/ Meghan M. McCalla*
Meghan M. McCalla
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Jeremy Sporn.

*s/Meghan M. McCalla*
Meghan M. McCalla
Assistant United States Attorney